```
┌─────────────────────────────────┐
│ USDC SDNY                       │
│ DOCUMENT                        │
│ ELECTRONICALLY FILED            │
│ DOC #:_____         │
│ DATE FILED: 12/23/2022          │
└─────────────────────────────────┘
```

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

LINK MOTION INC.,

                    Plaintiff,

            - against -

DLA PIPER LLP (US) and CARYN G.
SCHECHTMAN,

                    Defendants.

---

**22 Civ. 8313 (VM)**

<u>**DECISION AND ORDER**</u>

**VICTOR MARRERO, United States District Judge.**

Plaintiff Link Motion Inc. ("LKM") originally filed this action in New York State Supreme Court, New York County (the "State Court") alleging legal malpractice against defendants DLA Piper LLP (US) and Caryn G. Schechtman (together "DLA") and seeking, among other relief, damages. DLA removed the action to this Court pursuant to 28 U.S.C. Section 1441(a) ("Section 1441(a)") based on the Court's original jurisdiction under 28 U.S.C. Section 1331 and supplemental jurisdiction under 28 U.S.C. Section 1367(a). (Dkt. No. 1.) In response, LKM filed the instant motion to remand the case to the State Court. (See "Motion," Dkt. No. 18; "LKM Brief," Dkt. No. 20; "Reply," Dkt. No. 23.) DLA opposes that motion. (See "Opposition," Dkt. No. 22.) Upon consideration of the submissions and the applicable legal authorities, and for the

reasons stated below, the Court **DENIES** LKM's motion to remand this case to the State Court.

## I.   BACKGROUND

In this action, LKM alleges legal malpractice by DLA stemming from its representation of LKM in another matter pending before this Court, <u>Baliga v. Link Motion Inc.</u>, No. 18 Civ. 11642 (VM) (S.D.N.Y.) (the "<u>Baliga</u> Action"). DLA briefly represented LKM when the <u>Baliga</u> Action was filed in December 2018.

The original complaint filed in the <u>Baliga</u> Action was styled as a verified shareholder derivative complaint and asserted various federal and state causes of action against LKM asserting securities fraud, as well as seeking the appointment of a receiver to prevent, among other things, further alleged "dissipation of [LKM] and its assets" and to "manage [LKM]'s operations." (<u>Baliga</u> Action, Dkt. No. 1 ¶¶ 36-37.)

DLA's representation was limited to nominally representing LKM when the <u>Baliga</u> Action was filed.[1]

---

[1] According to LKM's State Court malpractice complaint, DLA was hired by LKM in 2018 "to represent the Company in connection with the issuance of Class B shares to an investor" and to provide "general corporate advice." (Dkt. No. 1, Exh. A ¶¶ 12-13.) Although it appears outside the scope of their engagement, at LKM's request, "DLA appeared in [the <u>Baliga</u> Action] after [Baliga] filed its Complaint and [Order to Show Cause] in order to protect [LKM's] immediate interest in the emergency filing." (<u>Baliga</u> Action, Dkt. No. 28 at 3.)

Immediately after filing the _Baliga_ Action on December 14, 2018, the plaintiff, Wayne Baliga ("Baliga"), sought, and the Court entered, an ex parte Temporary Restraining Order ("TRO") and appointment of a receiver. (_See_ _id._ Dkt. No. 7.) The Court further directed the parties to advise on whether the TRO should be converted into a preliminary injunction. (_See_ _id._) By stipulation, DLA did not oppose the preliminary injunction or imposition of a receiver. (_Id._ Dkt. Nos. 22-23.) On February 1, 2019, the Court entered an order granting the preliminary injunction and appointing the receiver, Robert Seiden (the "Receiver"). (_Id._ "Receiver Order," Dkt. No. 26.) In pertinent part, the Receiver Order allowed the Receiver to "assume full control of [LKM]," including "the power to commence, continue, join in, and/or control any action, suit, arbitration or proceeding of any kind or nature." (_Id._)

DLA then sought to withdraw from its representation of LKM on March 1, 2019. DLA's justification for seeking withdrawal was based on LKM's purported failure to "pay outstanding and overdue legal fees owed to DLA despite repeated requests to pay," as well as LKM's lack of "cooperat[ion] in its representation by failing to respond to inquiries." (_Id._ Dkt. No. 28.) The Court granted DLA's

request. (See id.) Subsequently, Counsel[2] for LKM's then-Chair of the Board of Directors, Vincent Wenyong Shi ("Shi") filed a motion to discharge the receiver and to dismiss the action for lack of jurisdiction, primarily based on the technical argument that Baliga had failed to plead that he had actually purchased LKM securities. (See id. Dkt. Nos. 35-38.) On June 11, 2019, the Court granted the motion to dismiss in part (id. Dkt. No. 64) and Baliga filed an amended complaint on June 21, 2019 (id. Dkt. No. 68).

Nearly a year after the TRO was entered, an LKM registered shareholder, China AI Capital Limited ("China AI") moved to intervene as of right. (Id. Dkt. No. 111.) China AI was represented by attorney Jae H. Cho of Cho Legal Group, LLC.[3] After some further delay, China AI filed a brief in support of its motion, submitted over a year after DLA withdrew, raising the novel argument that Baliga lacked standing to bring a derivative lawsuit under the internal

---

[2] At that time, Shi was represented by Michael James Maloney ("Maloney") who was then associated with the law firm CKR Law LLP. On February 4, 2020, Maloney advised the Court that his address had changed and that he was now associated with the Felicello Law firm, which would eventually come to represent China AI in its suit against DLA, and which represents LKM here. (See Baliga Action, Dkt. Nos. 121, 125.)

[3] Felicello Law's website represents that the same Jae H. Cho who represented China AI as an intervenor is now Counsel at Felicello Law. See Jae H. Cho, FELICELLO LAW, https://felicellolaw.com/our-team/jae-h-cho (last visited Dec. 16, 2022).

affairs doctrine.[4] (Id. Dkt. No. 129.) China AI asserted that Cayman Islands law limits derivative actions to only registered shareholders; because Baliga held only American Depositary Shares ("ADSs") -- i.e., he was not a registered shareholder -- Baliga could not sue derivatively. (Id.)

In a well-reasoned opinion issued on September 4, 2020, Magistrate Judge Debra Freeman, to whom the Court had referred the action for pretrial supervision, denied China AI's motion to intervene. (See id. Dkt. No. 163.) But the issues raised by China AI regarding Baliga's status as a holder of only ADSs prompted questions as to "whether Baliga has standing to maintain this action." (Id. at 51.) Magistrate Judge Freeman directed Baliga to "file a second amended complaint, clarifying which of his asserted claims are derivative claims, and which are direct claims." (Id. at 53.) On October 5, 2020, Baliga filed a second amended complaint. (Id. "SAC," Dkt. No. 166.)

---

[4] The internal affairs doctrine is a choice-of-law rule. "Under New York law, claims related to corporate affairs (i.e. involving the rights and liabilities of corporations) are governed by the internal affairs doctrine," which "provides that the rights of shareholders of a foreign company (including the right to sue derivatively) are determined by the law of the place where the company is incorporated." Howe v. Bank of N.Y. Mellon, 783 F. Supp. 2d 466, 475 (S.D.N.Y. 2011). The doctrine reflects the reality that "only one State should have the authority to regulate a corporation's internal affairs -- matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders -- because otherwise a corporation could be faced with conflicting demands." Drenis v. Haligiannis, 452 F. Supp. 2d 418, 427 (S.D.N.Y. 2006) (citation omitted).

On November 4, 2020, LKM and Shi (now both represented by Felicello Law (see Dkt. No. 176)) moved to dismiss the SAC. And on June 11, 2021, Shi filed a motion to discharge the Receiver and dissolve the preliminary injunction. (Id. Dkt. No. 227.)

While those motions were pending, on December 20, 2021, China AI filed a derivative legal malpractice lawsuit against DLA in this district asserting federal diversity jurisdiction. That action was captioned China AI Capital Limited v. DLA Piper LLP (US), No. 21 Civ. 10911 (the "China AI Action"). China AI, now represented by the same counsel as LKM and Shi at Felicello Law, asserted that LKM could not bring the malpractice action because the Receiver refused to bring the claim and, while the Receiver was in place, the Board had "no authority to decide to take legal action on behalf of [LKM]." (China AI Action, Dkt. No. 1 ¶¶ 100, 102.)

The China AI Action mirrored theories first presented in China AI's motion to intervene in the Baliga Action. Like China AI's motion to intervene, its malpractice suit alleged that DLA committed legal malpractice by failing to raise the argument that Baliga lacked standing to sue derivatively under the internal affairs doctrine, such that the Receiver would never have been appointed. China AI made a thinly veiled accusation that the Receiver and Baliga were conspiring to

support a "hostile group of former shareholders who were actively attacking the Company" and that the "appointment of the Receiver resulted in unnecessary expenses . . . and the loss of corporate assets transferred to the Receiver's affiliates." (Id. ¶ 9.) The China AI Action was referred to this Court for assignment and accepted as related to the Baliga Action.

On March 9, 2022, Magistrate Judge Freeman issued a Report and Recommendation recommending that Shi's motion to dissolve the preliminary injunction and discharge the Receiver be granted in part and denied in part. See Baliga v. Link Motion Inc., No. 18 Civ. 11642, 2022 WL 2531535, at *9 (S.D.N.Y. Mar. 9, 2022) ("March R&R"). As relevant here, Magistrate Judge Freeman did "not recommend that the Court's prior [Receiver] Order be found to be void ab initio, nor [did she] recommend that the Receiver be discharged immediately." Id. at *1. Instead, she recommended that the Court find that the Receiver Order "was duly authorized when made." Id. After considering the parties' objections, this Court adopted the Report and Recommendation in full on August 25, 2022. Baliga v. Link Motion Inc., No. 18 Civ. 11642, 2022 WL 3699339 (S.D.N.Y. Aug. 25, 2022) ("D&O Adopting March R&R").

On September 6, 2022, China AI notified the Court that
it was voluntarily dismissing its DLA malpractice action.
China AI stated that it had "been advised that on September
1, 2022, the Board of Directors of LKM held a meeting and
decided to assume control over the claims asserted by China
AI in this action in light of the dissolution of the
preliminary injunction in the <u>Baliga</u> [A]ction." (<u>China AI</u>
Action, Dkt. No. 23.)[5]

LKM then brought the instant action in New York State
Supreme Court, New York County, on September 12, 2022. How
LKM brought its State Court suit was not without dispute.
DLA, the Receiver, and Baliga submitted that LKM did not yet
have the authority to bring a legal malpractice action before
the Receiver had been fully discharged. On October 7, 2022,
the Court addressed that dispute, finding that "the Board's
decision to assume control of the <u>China AI</u> [Action] violated
the Court's Orders . . . and enjoin[ed] the Board from meeting
and voting to take any new actions not directed by the
Receiver until the Receiver is fully discharged." <u>Baliga v.</u>

---

[5] China AI sought to voluntarily dismiss the action without notifying
shareholders, as may be required under Federal Rule of Civil Procedure
23.1(c). The Court denied that request and referred the dispute regarding
the proper notice that must be given to Magistrate Judge Figueredo. (<u>China
AI</u> Action, Dkt. Nos. 28, 38.) Also pending in that action is an unresolved
motion for sanctions brought by DLA under Federal Rule of Civil Procedure
11 related to China AI bringing and not voluntarily dismissing the
malpractice lawsuit. (<u>Id.</u> Dkt. No. 35.)

Link Motion, Inc., No. 18 Civ. 11642, 2022 WL 6091994, at *4 (S.D.N.Y. Oct. 7, 2022). By October 7, 2022, however, the State Court malpractice action brought by LKM had already been removed from State Court by DLA, referred to this Court, and accepted as related to the Baliga Action. So, despite finding that the LKM Board's actions violated certain of this Court's Orders, the Court found it was improper to attempt to un-ring the bell the parties had already rung and allowed the action to move forward.[6] (Dkt. No. 9.)

## II. **THE PARTIES' ARGUMENTS**

In its Notice of Removal, DLA asserts that this Court has jurisdiction under 28 U.S.C. Section 1331. DLA characterizes the malpractice action as a suit alleging "state law causes of action" that "arise under" federal law because the "state-law claim necessarily raise(s) a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." ("Notice of Removal," Dkt. No. 1 ¶ 3 (citing Grable & Sons Metal Prods., Inc. v. Darue Eng'g

---

[6] Before LKM sought remand, DLA filed a pre-motion letter under the Court's Individual Rules of Practice II.B., describing grounds warranting dismissal of the Complaint. (See Dkt. No. 7.) LKM filed a timely response. (See Dkt. No. 11.) On November 2, 2022, after LKM moved to remand the case, DLA informed the Court that the parties were unable to resolve the dispute on the letters and requested a pre-motion conference or a briefing schedule on its proposed motion to dismiss. (See Dkt. No. 21.)

& Mfg., 545 U.S. 308, 314 (2005)).) DLA also states that this Court has "supplemental jurisdiction" over the matter, under 28 U.S.C. Section 1367(a), because "it has original jurisdiction over the securities claims" asserted in the Baliga Action, which this Court found related to the disputes at issue here. (Id. ¶ 4 (citing Achtman v. Kirby, McInerney & Squire, LLP, 464 F.3d 328, 334-35 (2d Cir. 2006)).)

LKM counters that remand is required under the Supreme Court precedent set forth in Grable as refined in Gunn v. Minton, 568 U.S. 251 (2013). LKM argues that Gunn forecloses removal because there is no substantial federal interest "to the federal system as a whole," and the state has a heavier interest in the regulation of its attorneys. (See LKM Brief at 5-7.) LKM asserts that DLA's reliance on Gunn's predecessor, Grable, is unpersuasive. LKM also opposes DLA's argument that removal is appropriate under the Court's supplementary jurisdiction. LKM posits that the removal statute, 28 U.S.C. Section 1441, does not allow for removal based on supplemental jurisdiction, and the case that DLA cites for this proposition, Achtman, is inapposite because it did not involve removal. (Id. at 7-10.)

DLA replies that this case comprises the "something extra" that was lacking in Gunn (but was present in Grable) to satisfy the so-called substantiality requirement. DLA

asserts that the "something extra" is that, should this Court remand the case, it would allow the state court to "second-guess decisions that this Court has actually rendered" regarding the propriety of the receivership in the Baliga Action. (Opposition at 13-16.) In that way, DLA submits that a "substantial" federal question is raised "because the malpractice claim puts the Receiver's actions squarely at issue, asks a state court to overrule them, and seeks to recover damages based thereon." (Id. at 16.) Further, DLA argues that LKM concedes that the state court would need to be supervised by this Court, disrupting the "federalist structure" by "injecting itself into parallel state court proceedings." (Id. at 18.) Finally, DLA argues that Achtman, although not specifically about removal, compels the conclusion that a "federal court may properly assert supplemental jurisdiction over entire state law *actions*, as long as the state law action itself is sufficiently related to a separate, pending federal action." (Id. at 19.)

### III. **LEGAL STANDARD**

Under 28 U.S.C. Section 1441(a), a defendant may remove a case from a state court to federal court if the district court has original jurisdiction over the action. The removing defendant has the burden of establishing that removal is proper. See California Pub. Emps.' Ret. Sys. v. WorldCom,

Inc., 368 F.3d 86, 100 (2d Cir. 2004). A district court must remand the action to state court if it determines that it lacks subject matter jurisdiction. See 28 U.S.C. § 1447(c); see also In re Methyl Tertiary Butyl Ether Prods. Liab. Litig., 488 F.3d 112, 125 (2d Cir. 2007) ("[W]e have held that out of respect for the limited jurisdiction of the federal courts and the rights of states, we must resolv[e] any doubts against removability.") (internal quotation marks omitted).

A party is entitled to remove an action if it "could have brought it in federal district court originally . . . as a civil action 'arising under the Constitution, laws, or treaties of the United States.'" Grable, 545 U.S. at 312. So-called "arising under" jurisdiction is not limited to parties "pleading a cause of action created by federal law" but also includes "another longstanding, if less frequently encountered, variety of federal [] jurisdiction" where "federal-question jurisdiction will lie over state-law claims that implicate significant federal issues." Id. The so-called Grable-Gunn test is satisfied "if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." Gunn, 568 U.S. at 258.

Of particular importance here, the "substantiality inquiry" under <u>Grable-Gunn</u> is not met if the federal issue is only "significant to the particular parties in the immediate suit"; rather, courts must look "to the importance of the issue to the federal system as a whole." <u>Id.</u> at 260. To that end, only a "special and small category" of cases qualify for removal. <u>Empire Healthchoice Assurance, Inc. v. McVeigh</u>, 547 U.S. 677, 699 (2006); <u>see also</u> <u>NASDAQ OMX Grp., Inc. v. UBS Securities, LLC</u>, 770 F.3d 1010, 1019 (2d Cir. 2014).

## IV.  DISCUSSION

The parties do not dispute that the first two prongs of the <u>Grable-Gunn</u> test -- that a federal issue is necessarily raised and actually disputed -- are satisfied in this matter. The Court agrees that they are. Resolution of LKM's state malpractice claim necessarily raises arguments about Baliga's federal standing to assert claims, brought under the Securities and Exchange Act of 1934, 15 U.S.C. § 78a *et seq* (the "Exchange Act"), derivatively, and whether he had standing to request imposition of a receiver. Moreover, the malpractice suit necessarily raises the Court's federal jurisdiction and authority to impose the Receiver, as it did. These issues are actually disputed by the parties. Accordingly, as the first two prongs are satisfied, the Court must assess only the final two: (1) whether the federal issue

is substantial, and (2) whether exercising jurisdiction over the malpractice suit would disrupt the federal-state balance. The Court concludes that both prongs are satisfied, and that removal is appropriate under 28 U.S.C. Section 1331. Because it so concludes, the Court does not address the propriety of removal as a matter of supplemental jurisdiction.

A.   SUBSTANTIALITY

Under Grable-Gunn, substantiality acts as the primary limiting factor in determining which state-law claims satisfy federal "arising under" jurisdiction. It ensures "a serious federal interest in claiming the advantages thought to be inherent in a federal forum," and is consistent with the trend of federal courts "shying away from the expansive view that mere need to apply federal law in a state-law claim will suffice to open the 'arising under' door." Grable, 545 U.S. at 313. To open that door, the case in question must present some "broader significance" to the federal system constituting "an important issue of federal law that sensibly belong[s] in a federal court." Gunn, 568 U.S. at 260-61. As discussed below, the Court is persuaded that this case falls into the "small and special category" of cases in which a substantial federal issue is raised.

In reaching this conclusion, the Court begins with the legal groundwork underpinning the state law malpractice

claims: Baliga's standing under the Exchange Act and his standing to request, and the Court's jurisdiction to impose, a receivership. Both issues raise singularly federal questions. See 15 U.S.C. § 78aa(a) ("The district courts of the United States and the United States courts of any Territory or other place subject to the jurisdiction of the United States shall have exclusive jurisdiction of violations of this chapter or the rules and regulations thereunder."); see also Fed. R. Civ. P. 66 (requiring the administration of the receiver to "accord with the historical practice in federal courts or with a local rule"); Canada Life Assur. Co. v. LaPeter, 563 F.3d 837, 842 (9th Cir. 2009) ("Not only does Rule 66 require application of the federal rules in an action where the appointment of a receiver is sought, it specifically indicates a normative standard for uniform administration of receiverships in accordance 'with the historical practice in federal courts.'"). Accordingly, the Court is persuaded that resolving these two "disputed federal issue[s]" is "significant to the development of a uniform body of federal securities regulation [and federal receiverships]." NASDAQ OMX Grp., 770 F.3d at 1024.

While the primacy of federal law in securities regulation and receiverships is important, the Court recognizes that the mere presence of these issues may not be

sufficient to create a substantial federal issue that affects the federal system as whole. Rather, it is the procedural history and certain of this Court's Orders in the related Baliga Action that provide the "something extra" required, revealing the critical distinctions between this case and those like Gunn.

Contrary to Gunn, the State Court here is not faced with a "hypothetical 'case within a case,'" because this Court has already addressed Baliga's standing and the propriety of the receivership. Gunn, 568 U.S. at 261. This issue, potentially enabling LKM to get a second chance at a favorable decision in the State Court, raises a unique federal interest that would affect the justice system as a whole: it would allow a plaintiff to forum shop and enable state courts to undermine a federal court's authority to "manage its proceedings, vindicate its authority, and effectuate its decrees." Baliga, 2022 WL 6091994, at *1 (quoting Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 380 (1994)). Accordingly, this case presents a "nearly pure issue of [federal] law, one that could be settled once and for all and thereafter would govern" other similar proceedings. McVeigh, 547 U.S. at 701.

### 1.   Federal Law is Dispositive of the Case

The Court finds that the content and timing of LKM's decision to bring its malpractice suit in State Court

constitutes merely a collateral attack on the Court's past orders. Several considerations bolster that conclusion: that the State Court action was filed after China AI, represented by the same attorneys, brought the same suit in federal court, and after Shi and LKM's motion to discharge the receiver (again brought by the same attorneys), had argued the same underlying issues, claims which the Court had rejected. Rearticulating the holding of that previous order at this point presents a pure issue of federal law that is dispositive of this case.

The Court finds the reasoning in New Life Ventures, Inc. v. Locke Lord LLP, No. 19 Civ. 162, 2019 WL 13212632, at *3 (E.D. Tex. Sept. 27, 2019) persuasive as applied to the issues here in dispute. In New Life, a party's motion for attorney's fees was denied by the district court and that denial was affirmed by the Federal Circuit. Then, the losing party brought a new action in state court, seeking, "under the guise of state law, what it ha[d] twice been denied under the federal law." Id. After the state court action was removed, the federal district court in New Life concluded that resolution of the attorney's fees claim "would require a reopening of the issues already decided," and that by seeking "to overturn the result of the prior federal [] litigation," the party was seeking a remedy that, unlike Gunn, *would*

"change the real-world result of the prior federal []
litigation." Id.

LKM appears to seek the same result here. This Court has
already adjudicated the jurisdictional issues concerning
Baliga's standing to bring the federal securities claims he
initially asserted in this action, and substantively
determined that, despite amending those claims, appointing
the Receiver was appropriate. LKM's contentions would
effectively undermine those rulings.

In her March 2022 Report and Recommendation, which was
adopted in full by this Court over LKM and Shi's objections,
Magistrate Judge Freeman found that "even if Baliga lacked
standing to bring certain of his original claims, he at least
had standing to bring the securities-law claims that he
seemingly sought to plead derivatively in his initial
Complaint, and that this afforded the Court subject-matter
jurisdiction to issue the [preliminary injunction and
Receiver Order]." March R&R, at *9. Judge Freeman reached
that conclusion through a thorough and well-reasoned analysis
of Baliga's standing to assert federal derivative securities
claims against the backdrop of the very claims asserted by
LKM here: whether the internal affairs doctrine and Cayman
Islands law deprived Baliga of standing to seek appointment
of the Receiver. This Court agreed with and adopted Magistrate

Judge Freeman's finding that "as long as the Court had jurisdiction over the action, it would have had the general equitable power to have issued interim equitable relief, including the appointment of a receiver, regardless of whether Baliga's request for such relief had been primarily premised on a claim as to which he lacked standing." Id. at *11; see generally D&O Adopting March R&R; see also 12 Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE § 2983 at n.9 (3d ed. 2022) ("A federal court, under the general equity powers and independently of any state statute, may entertain a bill of a stockholder against the corporation for the appointment of a receiver in order to prevent the threatened diversion or loss of assets through the gross fraud and mismanagement of its officers."). In reaching this conclusion, Magistrate Judge Freeman rejected the notion that the issue of derivative standing "to assert [] Exchange Act claims [] governed by federal law" should be influenced by state law. March R&R, at *11-12 ("Federal law must be consulted to decide whether there is standing to sue under the Exchange Act." (internal citation omitted)). This analysis was distinct from her finding that applying Cayman Islands law via the internal affairs doctrine was appropriate for Baliga's then-pled state law claims, such as his claim for breach of fiduciary duty. See id. at *10-12. The

determination of Baliga's derivative standing under federal law constitutes the same pure question of federal law that will need to be addressed in the malpractice suit.

Yet, dissatisfied with that result, LKM wasted no time in improperly voting to take over the mirror-image malpractice lawsuit brought by China AI pending before this *federal* Court and running across the square to refile it in the State Court. See also Baliga, 2022 WL 6091994, at *2 (finding LKM's vote to take over the malpractice lawsuit violated this Court's Orders). The Court finds that, in doing so, LKM's actions amount to an attempt to use the State Court to change the "real-world result" of this Court's decisions. See Gunn, 568 U.S. at 261.

LKM's attempt to hide behind Gunn's strictures is transparent. It argues that the malpractice suit is a "run-of-the-mill legal malpractice case," which requires only that the "state court answer[] the hypothetical questions of what would have happened in the context of a legal malpractice case-within-a-case." (Reply at 2.) LKM asserts that it is merely "seeking its first bite at the malpractice apple," and not to "vacate or amend prior orders of the Court or actions of the Receiver." (Id. at 5-6.) The Court disagrees. LKM has had multiple apples in the course of this litigation, and taken bites at several of them.

The result that Shi and LKM sought by moving in the
Baliga Action to vacate the Receiver order *ab initio* was an
unwinding of the Receiver's actions and a preparation of an
accounting. (See Baliga Action, Dkt. No. 227.) Ultimately,
Shi and LKM sought to shift all costs of the Receivership off
LKM and onto Baliga, an argument this Court has already
considered and rejected. See D&O Adopting March R&R, 2022 WL
3699339, at *6 (rejecting Shi's argument that "Baliga should
be charged the costs of the Receiver for the period up to
October 5, 2020"). Such costs are among the same as those
that the malpractice suit now seeks DLA to bear. (See Dkt. 1,
Exh. A ¶ 69.b. (demanding from DLA "[t]he costs and expenses
associated with the Receiver and the receivership").) LKM's
success in this malpractice suit in the State Court action
would thus have the "real-world" practical consequence of
reversing the Court's Order regarding the appropriateness of
the receivership and the proper disbursement of costs, by
shifting those costs, and others, to DLA. That prospect was
not present in Gunn. The Court finds LKM's attempt to inject
it here is impermissible and justifies DLA's removal of the
action to this Court.

2.   Precedential Impact of the Decision

This case differs from Gunn for another reason. In Gunn,
the Supreme Court explored the precedential effect of a state

court assessing federal issues. See 568 U.S. at 261-62. The Supreme Court explained that in the normal course of resolving cases, such as patent actions, that involve pure questions of federal law, "federal courts are of course not bound by state court case-within-a-case [] rulings." Id. at 262. In the same vein, in answering the hypothetical question, the Supreme Court emphasized that "state courts can be expected to hew closely to the pertinent federal precedents." Id. What Gunn does not address is the interplay of federalism where the hypothetical questions have been answered by federal court rulings on the same or closely related issues raised in the underlying federal court action. Such is the case here.

Nevertheless, LKM contends that the malpractice lawsuit consists of only hypothetical issues. Through a string of rhetorical questions, LKM posits that the main issues in the malpractice suit are: (1) whether "the federal Court [would] have entered the preliminary injunction and receivership had [DLA] raised Baliga's standing or challenged his securities claims as deficient" or "told the Court that the Company consented when Defendants did not obtain informed consent from their client"; and (2) whether "the federal Court [would] have required a bond if Defendants had requested [one.]" (Reply at 5.) The answer to the first question is "No," and it is dispositive.

But in attempting to hedge its bet that these are hypothetical questions, LKM exposes the weakness of its hand: as explained above, the question of whether "the federal Court [would] have entered the preliminary injunction and receivership had Defendants raised Baliga's standing or challenged his securities claims as deficient" has already been answered. With LKM's bluff called, LKM offers no other persuasive justification for why the various questions it raises about what a *federal* court assessing questions of *federal* jurisdiction might do (and has already done) are better answered by the State Court. The Court is persuaded that there is no justifiable basis for such a course.

Further, and adhering to Gunn's dictate, while this Court has no reason to doubt that, applying the doctrines of issue and claim preclusion, the State Court would likely follow this Court's previous rulings on this matter, the possibility that the State Court would not adhere to the law of the case raises the potential to "undermine the development of a uniform body of [securities] law." Gunn, 568 U.S. at 261. Were the State Court to find -- contrary to the March R&R as adopted by this Court -- that Baliga's original complaint did not plausibly assert derivative federal securities claims such that the Court would not have had jurisdiction to appoint the Receiver, such a ruling as to the

federal standard to assert such claims would be controlling in state courts without "opportunity for correction by the federal courts." See New Life, 2019 WL 13212632, at *4.

In sum, the practical effect of finding remand appropriate in this narrow circumstance would affect the federal system as a whole, largely by providing parties a procedural loophole. That loophole is critical. Although framed as a malpractice suit, what LKM essentially seeks is reconsideration by the State Court of this Court's findings as to jurisdiction and the propriety of the Receiver -- a course of action that would fail to meet this Circuit's stringent standards for such a motion.[7] Allowing a state court to reach and change determinations already made by the federal court disrupts principles of comity and undermines a federal court's ability to manage its docket and effect its decrees. Accordingly, the Court finds that these circumstances raise a substantial federal issue.

---

[7] Motions for reconsideration arise under Federal Rule of Civil Procedure 60(b) and Local Civil Rule 6.3 and are "an extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources." In re Health Mgmt. Sys., Inc. Sec. Litig., 113 F. Supp. 2d 613, 614 (S.D.N.Y. 2000). They are "intended to 'ensure the finality of decisions and to prevent the practice of a losing party examining a decision and then plugging the gaps of a lost motion with additional matters.'" SEC v. Ashbury Capital Partners, L.P., No. 00 Civ. 7898, 2001 WL 604044, at *1 (S.D.N.Y. May 31, 2001) (quoting Carolco Pictures, Inc. v. Sirota, 700 F. Supp. 169, 170 (S.D.N.Y. 1988)). Accordingly, the Second Circuit has held that the standard for granting a motion to reconsider "is strict." Shrader v. CSX Transp., Inc., 70 F.3d 255, 257 (2d Cir. 1995); see also Analytical Surveys, Inc. v. Tonga Partners, L.P., 684 F.3d 36, 52 (2d Cir. 2012).

B.   FEDERAL-STATE BALANCE

The final consideration under the Grable-Gunn test is whether the issue is "capable of resolution in federal court without disrupting the federal-state balance approved by Congress." Gunn, 568 U.S. at 258. As alluded to above, unique federalism concerns abound in this case. Moreover, the Court finds it would be inappropriate for this Court to "supervise" or place "reasonable limitations" on the State Court, a point conceded by LKM, as doing so would further disrupt the federal-state balance. The Court is persuaded that such interests outweigh the State Court's "special responsibility for maintaining standards among members of the licensed professions." Id. at 264.

Ultimately, "far from threatening the federal-state balance envisioned by Congress in this area, the exercise of federal jurisdiction here comports with Congress's expressed preference for alleged violations of the Exchange Act, and of rules and regulations promulgated thereunder, to be litigated in a federal forum." NASDAQ OMX Grp., 770 F.3d at 1030 (citing 15 U.S.C. § 78aa(a) ("The district courts of the United States and the United States courts of any Territory or other place subject to the jurisdiction of the United States shall have exclusive jurisdiction of violations of this chapter or the rules and regulations thereunder, and of all suits in equity

and actions at law brought to enforce any liability or duty created by this chapter or the rules and regulations thereunder.")).[8] State courts facing the issues present here would be required to determine when a plaintiff has derivative standing for Exchange Act violations; "[t]hat barrier may, and invariably will, differ from state-to state." New Life, 2019 WL 13212632, at *5. Accordingly, because "the issues of inconsistency and forum shopping" that may arise by allowing the State Court to act are at odds with Congressional expectations of the federal-state balance, the Court determines that the final Grable-Gunn factor is satisfied here.

_____

[8] In NASDAQ OMX Grp., the Second Circuit declined to revisit its prior decision in Barbara v. New York Stock Exchange, Inc., 99 F.3d 49 (2d Cir. 1996), which, in turn, declined to adopt a reading of 15 U.S.C. Section 78aa as conferring "exclusive federal jurisdiction" even for "certain disputes involving state law claims." 770 F.3d at 1030. Barbara, however, has since been abrogated by Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning, 578 U.S. 374 (2016). It is true that Merrill Lynch, read broadly, endorses LKM's argument that "state courts, in deciding state-law claims, [may] address possible issues of the Exchange Act's meaning." Id. at 391. However, in the narrow circumstances presented here, the Court is persuaded that Merrill Lynch either does not apply, or urges a different result. In particular, Merrill Lynch's deference to state courts acknowledges that state courts are more likely to face issues of federal statutory interpretation, strengthening the rationale in New Life that state standards will vary and could undermine certain federal uniformity. Thus, in unique circumstances like those here, it is pragmatic for courts to exercise caution to avoid further disruption of a uniform set of federal laws. To that end, "it suffices for [the Court] to identify the jurisdiction[al] grant of § 78aa as a signal that [it] will not upset the appropriate balance of federal and state judicial responsibilities by exercising federal jurisdiction in this case, where state claims necessarily raise a disputed issue about" standing under the Exchange Act. NASDAQ OMX Grp., 770 F.3d at 1030 (conducting analysis under the Grable-Gunn test, not Barbara).

With all four of the <u>Grable-Gunn</u> considerations established, the Court concludes that DLA has met its burden in showing that the Court would have original jurisdiction under 28 U.S.C. Section 1331, and that removal of the action from the State Court to this Court under Section 1441(a) is appropriate.

## V.   <u>ORDER</u>

For the reasons stated above, it is hereby

**ORDERED** that the motion to remand this cause of action to the Supreme Court of New York, New York County made by plaintiff Link Motion, Inc. ("LKM") (Dkt. No. 18) is **DENIED;** and it is further

**ORDERED** that upon review of the pre-motion letters filed by defendants DLA Piper LLP (US) and Caryn G. Schechtman (together "DLA") and LKM's response thereto, <u>see</u> Note 6 *supra*, the Court is not persuaded that a pre-motion conference is necessary to resolve the parties' dispute. By January 13, 2023, the parties shall notify the Court whether they consent to the Court deeming the pre-motion letters as a fully briefed motion and ruling on the basis of such letters, or whether the parties request supplemental or full briefing on DLA's proposed motion. If the parties request supplemental or full briefing, they shall submit a proposed briefing schedule by January 13, 2023.

**SO ORDERED.**

Dated:      23 December 2022
            New York, New York

_____
            Victor Marrero
            U.S.D.J.